IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AMANDA MARSH, a minor child, | ) | |
| by and through her father and next | ) | |
| friend, ROBERT J. MARSH; and | ) | |
| ROBERT J. MARSH, individually | ) | |
| and as next friend of Amanda Marsh, a | ) | CIVIL NO. 03-4202-JLF |
| minor child, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SCHOOL BOARD OF MARION | ) | |
| COMMUNITY UNIT SCHOOL | ) | |
| DISTRICT NUMBER 2, a body politic | ) | |
| and corporate, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

FOREMAN, District Judge:

Before the Court is defendant's motion for summary judgment (Doc. 82). Plaintiffs have filed a response (Doc. 91) and defendant has filed a reply (Doc. 92).

## I.   Background.

In the beginning, plaintiff Amanda Marsh (Mandy) was a fourth-grade student at Washington Elementary School. By the time of the parties' instant pleadings, Mandy had become a sixth-grade student at Marion Junior High School. Both Washington Elementary Schools and Marion Junior High are public schools administered and operated by defendant. Mandy's father is plaintiff Dr. Robert J. Marsh.

Plaintiff Dr. Marsh and his family are former members of a Southern Baptist Church in Marion, Illinois, called the Cornerstone Community Church. (Doc. 90, Exh. E, p.46). In

the words of Dr. Marsh's wife, (Dr. Jan Bowman-Marsh), the reason that the Marshes are no longer members of the Cornerstone Community Church is that they were "kicked out of there." (Doc. 82, Exh. D, p.40). Defendant's Superintendent, Dr. Wade Hudgens, happens to be a Deacon at the Second Baptist Church in Marion, Illinois. (Doc. 90, Exh. H, pp.159-160).

The genesis for this action concerns defendant-sponsored school assemblies that were held on November 17th and 18th, 2003. According to plaintiffs, Superintendent/Deacon Hudgens organized these assemblies so that the schools could feature an evangelical speaker named Dr. Ronnie Hill, pastor of Ronnie Hill Ministries, Fort Worth, Texas. In connection with the assemblies, student supporters of Dr. Hill were planning to distribute tickets to evening pizza parties that would be held at the Cornerstone Community Church. Prior to being fed, however, the students first had to listen to a sermon by Dr. Hill.

On Friday, November 14, 2003, plaintiffs filed a complaint, a motion for temporary restraining order, and an emergency motion for an immediate hearing seeking to enjoin defendant from allowing Dr. Hill or any other religious speaker to appear at the school assemblies. (Docs. 2,3,4). Later that day, and over the weekend, the parties worked together to reach an agreement as to how the school assemblies would be conducted so that all parties' interests would be met. On Monday morning, November 17, 2003, this Court reviewed, approved, and entered an Order designed to fulfill that purpose. (Doc. 7).

Under the Order, Dr. Hill was allowed to speak at the school assemblies, however, his presentation was limited to secular topics, such as encouraging teens to refrain from using

drugs and alcohol. (Doc. 7).  Furthermore, he was not allowed to advertise the pizza party or his evening appearances at the Cornerstone Community Church.  Finally, the Order directed defendant to comply with its policy regarding the distribution of non-school sponsored materials.  Specifically, defendant was ordered and directed to notify all staff and students at the beginning of the school days on November 17th and 18th, 2003, that there shall be no distribution on school premises for one hour prior and one hour after the school day of any non-school sponsored written materials, irrespective of content.  The Order also stated that should any building administrator observe a violation of this directive, such materials were to be confiscated.

Despite efforts to resolve the controversy peaceably and without further ado, the situation appears to have risen into somewhat of a confused frenzy.  Apparently, parents and students attempted to circumvent the Court's Order and distribute tickets to the pizza party.  For example, Dr. Marsh testified that in the early morning on November 17, 2003, he observed parent-supporters of Dr. Hill walk onto school property holding pizza party tickets, presumably waiting to distribute them to students. (Doc. 90, Exh. E, pp.154-155).  He also observed a parent walk onto Washington Elementary School property, and give tickets to a school bus driver. (Doc. 90, Exh. E, p.154).  Mandy Marsh testified that one of her teachers told students that they could not pass out tickets during class time but that they could do so during the day, "in hallways on free time." (Doc. 90, Exh. G, pp.13-14).  Ultimately, students scattered tickets onto desks and benches, and pinned tickets to their clothing and allowed other students to remove them. (Doc. 90, Exh. K, p.1).  One of Mandy's friends handed her

a ticket as she was walking through the hallway between class periods. (Doc. 82, Exh. C, pp.13-14).

Four months later, on March 24, 2004, Dr. Marsh went to defendant's garbage dumpster and gathered five bags of trash. (Doc. 90, Exh. P, ¶ 1). Dr. Marsh's affidavit states that he gathered defendant's trash on a regular basis as part of a "regular investigative process" that was connected to his legal disputes with the Marion School Board and Superintendent/Deacon Hudgens. (Doc. 90, Exh. P, ¶ 1). After seizing the five bags of trash, Dr. Marsh secured them in his vehicle and executed his search at another location. (Doc. 90, Exh. P, ¶ 1).

After separating the wheat from the chaff, Dr. Marsh found one small bag of trash that contained various items such as phone messages and tobacco spit indicating that it came from Dr. Hudgens' office. (Doc. 90, Exh. P, p.2). After examining the contents of this bag, Dr. Marsh found a letter from Dr. Hudgens' legal counsel dated December 17, 2003. (Doc. 90, Exh. P, p.2). This letter is attached to Dr. Marsh's deposition as defendant's Exhibit 14. (Doc. 90, Exh. E, Def. Exh. 14).

Over a year and a-half later, on December 2, 2005, plaintiffs filed a second amended complaint. (Doc. 74). Plaintiffs' second amended complaint alleges that defendant violated their rights to free exercise of religion and to be free from unconstitutional establishment of religion under the First Amendment to the United States Constitution. Specifically, plaintiffs' second amended complaint alleges that over the last several years, defendant has intentionally sought to use the public schools to indoctrinate students with specific religious

- 4 -

teachings of the Baptist faith by:

1) requiring teachers, or approving and encouraging the policy of requiring teachers, to disseminate religious materials in class and instruct students to either take them home or read them, or both;

2) favoring applicants for employment positions in the District on the basis of their religious faith or affiliation, and in particular, favoring applicants of the Baptist faith;

3) Encouraging, or acting in complicity, with teachers who impart religious teachings to public school students during classtime – specifically, teachers at Marion Junior High School and Marion High School;

4) Encouraging, or acting in complicity, with teachers who knowingly plan School District-sponsored programs or events that subject public school students to religious teachings – specifically including Marion Junior High School music teacher Armetta Belz, who organized a Summer theater program that included mandatory performances during a church service; and

5) Sponsoring a Teaching institute event, in February 2005, for District teachers in which a "Christian counselor," Kent Maddox, made a religious-oriented presentation that included quoting scripture.

*(Doc. 74, p.3).*

With regard to the Dr. Ronnie Hill assemblies, plaintiffs' second amended complaint alleges that defendant violated the Court's November 17, 2005 Order because:

1) Superintendent Hudgens failed to stop a parent from entering school property for the purpose of disseminating tickets to the church pizza party;

2) school officials failed to make the required public address announcements at the Marion Junior High and Marion High Schools;

3) school officials failed to stop the dissemination of pizza party tickets when students had pinned tickets to their clothing and allowed other

- 5 -

students to remove them; and

4)      school officials failed to stop the dissemination of pizza party tickets by
        a cafeteria worker who had pinned a ticket to her clothing.

*(Doc. 74, p.7).*

In sum, plaintiffs' second amended complaint alleges that defendant violated the First

Amendment in five areas by:

1)      approving the policy of requiring teachers to disseminate religious
        materials in class, with instructions to students;

2)      favoring applicants for employment positions in the District on the
        basis of their religious faith or affiliation;

3)      facilitating, orchestrating, committing resources to, and endorsing the
        assemblies featuring Dr. Hill; and failing to observe and enforce the terms of
        the Court's Order;

4)      approving or encouraging the practice of public-school teachers
        imparting religious messages or teachings in class; and

5)      approving or encouraging the practice of public-school students being
        coerced or pressured into hearing religious sermons at a church when
        participating in the public-school sponsored programs.

*(Doc. 74, pp.7-8).*

Plaintiffs request an injunction permanently enjoining defendant from engaging in

these activities, as well as a declaration that defendant's actions violate the Establishment and

Free Exercise Clauses of the First Amendment and the Due Process Clause of the Fourteenth

Amendment.  Finally, plaintiffs seek compensatory damages, other relief, attorneys fees and

costs.  Defendant's motion for summary judgment is discussed below.

**II.      Summary Judgment Standard.**

- 6 -

Summary judgment is granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*. To determine whether there are any genuine issues of material fact, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir.2001). The court also draws all reasonable inferences from undisputed facts in favor of the non-moving parties and views the disputed evidence in the light most favorable to the non-moving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

The non-moving parties, however, may not rest upon mere allegations in the pleadings or speculative affidavits. They must go beyond the pleadings and support their contentions with admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Only competing evidence regarding facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 249. If the non-moving parties would be unable to prove an element essential to their case, one on which they would bear the burden of proof at trial, summary judgment should be granted to the moving party. *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996).

## III.    <u>The Establishment Clause and Free Exercise Clause.</u>

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." *U.S. Const. amend. I, cl. 1*. This mandate applies to the states through the Fourteenth Amendment. *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940).

The Establishment Clause requires "government neutrality with respect to religion." *Fleischefresser v. Directors of School District 200*, 15 F.3d 680, 685 (1994) (*citing School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 215 (1963)).  To establish a violation of the Establishment Clause, plaintiffs must prove that: 1) the purpose of the state action is to aid or promote religion; 2) the primary effect of the action is to aid or promote religion; or 3) the result is excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

The first prong of the *Lemon* test, (the purpose prong), asks whether the government's actual purpose is to "endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (*quoting Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J. concurring)). "Government action is improper where there is no secular purpose to support it, but to determine that there is no secular purpose, we must find that the action was 'motivated wholly by religious considerations.'" *Fleischefresser,* 15 F.3d at 688 (*citing Lynch, 465 at* 680)).   Under the second prong of the *Lemon* test, (the primary effect prong), the government's action is proper if its primary effect is neither to advance nor inhibit religion. For government action to constitute an impermissible advancement of religion, that action must amount to an "endorsement" of religion. *Lynch*, 465 U.S. at 681.  The third prong of the *Lemon* test, (the excessive entanglement prong), has been defined as "excessive administrative entanglement," *Lynch,* 465 U.S. at 683, and as a "comprehensive, discriminatory, and continuing state of surveillance." *Lemon*, 403 U.S. at 619.

The Free Exercise Clause recognizes the right of every person to choose among types

- 8 -

of religious training and observance, free of state compulsion. *Abington Sch. Dist.*, 374 U.S. at 222.  This right includes the right of parents to control the religious upbringing and training of their minor children. *Wisconsin v. Yoder*, 406 U.S. 205, 230-31 (1972).

In *Fleischefresser,* the United States Court of Appeals for the Seventh Circuit reminds this Court that in elementary school settings, alleged violations of the Establishment Clause present "heightened concerns for courts." *Fleischefresser,* 15 F.3d at 686 (*citing Sherman v. Community Consol. School Dist. 21 of Wheeling Tp*, 8 F.3d 1160, 1164 (1993)). *Fleischefresser* also reminds this Court, however, that "this heightened concern is balanced to a great degree by the broad discretion of a school board to select its public school curriculum." *Fleischefresser,* 15 F.3d at 686 (*citing Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).  This Court is to "inject itself in a controversy regarding the daily operation of this school system only if basic constitutional values are 'directly and sharply implicate [d].'" *Fleischefresser,* 15 F.3d at 686 (*citing Epperson v. State of Ark.*, 393 U.S. 97, 104-05 (1968), and *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982) ("[T]he discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.")).

## IV.   **Discussion.**

Plaintiffs' five claims are discussed separately below.

### A.   **Defendant's Alleged Distribution of Religious Materials.**

Plaintiffs claim that defendant has violated the First Amendment by approving a

- 9 -

policy that requires teachers to disseminate religious materials in the classroom.

### 1.   __Undisputed Facts.__

Defendant has a written policy which states that:

> All students are entitled to enjoy the rights protected by the federal and
> State Constitutions and laws for persons of their age and maturity in a
> school setting.
>
> ***

*(Doc. 82, Exh. A, Att.2, p.1).*

Defendant also has a written policy that governs the distribution of written materials

at school.  This policy states that:

> The distribution of non-school sponsored written material shall
> occur at a time and place and in a manner that will not cause
> disruption, be coercive, or result in the perception that the
> distribution or the material is endorsed by the School District.

*(Doc. 82, Exh. A, Att.1, p.2).*

During the Fall of 2003, Mandy Marsh routinely brought home her take-home folder

from school.  Inside this folder, Mandy's teachers frequently placed several flyers that

promoted youth programs and activities, (e.g., Christmas programs), that were being

sponsored by local Baptist Churches.  (Doc. 90, Exh. E, pp.46-49).  During this same time

period, Mandy also received in her take-home folder informational flyers from the Girl Scout

organization, as well as from the local community youth soccer league, both of which are

secular organizations. (Doc. 82, Exh. C, p.9; Exh. D, pp.29-30) (Exh. 90, Exh. E, p.48).

Sometime after the Fall of 2003 or Spring of 2004, it became defendant's practice not to have

teachers put these flyers into take-home folders but to instead place information regarding

- 10 -

community events on tables in the school hallways where students could access them. (Doc. 82, Exh. A, ¶63) (Doc. 90, Exh. E, p.69).

### 2.   <u>Analysis.</u>

Plaintiffs allege that defendant violated the First Amendment by instructing its teachers to place flyers regarding Baptist youth programs and activities in Mandy's take-home folder.  Although plaintiffs have not submitted copies of all of these flyers, (*see e.g.*, Doc. 90, Exh. J, pp.30-32), the record testimony is that these flyers generally promoted events such as holiday programs and church-sponsored sports leagues at nearby churches.

Defendant has shown that its written policy is to limit the distribution of non-school sponsored material to a time, place, and manner that will not be disruptive, coercive, or result in the perception that the material is endorsed by the District.  Plaintiffs, however, allege that defendant was not following its written policy.

Upon review, plaintiffs have failed to show that such flyers are "religious" materials that violate the Establishment Clause.  The record testimony is that the flyers informed students about youth activities or programs at local churches such as holiday programs and church-sponsored sports leagues.  There is no evidence that any of the flyers contained overtly religious messages or that they compelled students to participate in any religious exercise.  Moreover, plaintiffs have admitted in their depositions that along with distributing the church flyers, defendant distributed flyers for other organizations, such as the Girl Scouts and a secular youth soccer league.  Because the church flyers were being distributed in the same manner as the flyers for the secular organizations, the distribution of the church

materials does not violate the First Amendment.  *See e.g., Child Evangelism Fellowship of New Jersey Inc. v. Stafford Township School District*, 386 F.3d 514 (3rd Cir. 2004) (where other materials were distributed at school in a limited open forum, the distribution of materials relating to an evangelical group did not violate the Establishment Clause of the First Amendment); and *Rusk v. Crestview Local School District,* 379 F.3d 418, 422 (6th Cir. 2004) ("not even impressionable elementary students are likely to misperceive the practice of distributing flyers from a variety of community organizations as endorsing religion").  Finally, plaintiffs have not come forth with any evidence that defendant's Board either approved, or was aware of, the alleged distributions.  As such, plaintiffs cannot establish municipal liability under 42 U.S.C. § 1983.  *See Gernetzke v. Kenosha Unified School District No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) (to prevail on § 1983 claim, plaintiffs must show that the district itself, which is to say the officials or official boards that constitute the relevant final decisionmaking authority (legislative or executive) within the district, was directly responsible for the deprivation).  For these reasons, plaintiffs' claims regarding the distribution of religious materials must fail.[1]

### B.   Defendant's Hiring Practices.

Plaintiffs allege that defendant violated their First Amendment rights by hiring

---

[1]Dr. Marsh asserts that defendant distributed flyers from only Baptist churches and not from churches of other denominations. (Doc. 90, Exh. E, p.48).  Marsh's testimony, however, is contradicted by his own witness, Dr. Richard Angel.  Dr. Angel testified that during his last year as a principal at Creal Springs, Illinois, (2002-2003), he was instructed to, (and did), distribute a flyer for a Christmas Program that was being held at a nearby Methodist Church. (Doc. 90, Exh. I, pp.6-10,25).

employees based on religious affiliation, particularly, members of the Baptist Faith. Specifically, plaintiffs offer evidence that from approximately July, 2002 until April, 2004, newly hired Dr. Hudgens, (a Baptist), took an active role in defendant's hiring process. Plaintiffs also offer evidence that of the 68 known new hires during that period, at least 34 were Baptists.  Plaintiffs also claim that Dr. Hudgens denies taking an active role in the hiring process, and that several teachers and principals contradict his testimony in this regard.

### 1.   <u>Undisputed Facts.</u>

Defendant has an employment policy labeled District Policy Number 5:10 which states that the " School District shall provide equal employment opportunities to all persons regardless of their race, color, religion, creed . . .and other legally protected categories." (Doc. 82, Exh. A, Att.4, p.1).  Plaintiffs are not employees of the district, nor have they ever applied for or been denied employment at the District. (Doc. 82, Exh. A, ¶20).

Dr. Marsh testified at his deposition that he did not know of any written policy of defendant that would authorize the administration to ask job applicants questions about their religious faith. (Doc. 82, Exh. B, p.100).  Dr. Marsh further testified that he has reviewed various teacher applications for employment with defendant, and none of the applications had any references to any religious information. (Doc. 82, Exh. B, p.133).  Neither plaintiff has ever been present during any applicant interviews, nor have plaintiffs been present for hiring discussions. (Doc. 82, Exh. A, ¶21).

Dr. Marsh testified that he did not know what percentage of citizens in Marion, Illinois, are members of the Baptist faith. (Doc. 82, Exh. B, p.122).  Dr. Marsh also admitted

that he did not know what percentage of Marion citizens are members of the Second Baptist Church. (Doc. 82, Exh. B, p.122). When asked what steps he took to verify who the new hires were and whether they were Baptists, Dr. Marsh responded, "We basically left that part of our investigation fall to the back burner when it appeared as though the practices were changing." (Doc. 82, Exh. B, p.116). When asked how the practices had "changed," Dr. Marsh stated that "[i]t appears that there is not an inordinate number of new hires being hired that attend Second Baptist Church at this moment." (Doc. 82, Exh. B, p.116). To support his allegations, however, Dr. Marsh has submitted a chart to show that from July 1, 2002, (when Dr. Hudgens arrived), and early 2004, at least 34 out of 68 new hires belong to either a Baptist church or to another church with similar evangelical tendencies. (Doc. 90, Exh. Q).

## 2.   **Analysis.**

Defendant argues that plaintiffs have no standing to challenge defendant's hiring practices because neither Dr. Marsh nor his daughter are employees of defendant nor have they ever been denied employment by defendant. It is clear, however, that plaintiffs are not bringing their claims based upon a denial of employment, but as alleged violations of the Establishment and Free Exercise clauses.

The United States Court of Appeals for the Seventh Circuit has held that parents have standing to raise Establishment Clause violations when the impermissible establishment of religion might inhibit their right to direct the religious training of their children. *Fleischfresser*, 15 F.3d at 683-84 (*citations omitted*). As to alleged Free Exercise violations, parents have standing if they claim infringement of their personal religious freedom.

- 14 -

*Fleischfresser*, 15 F.3d at 684 (*citing McGowan v. Maryland*, 366 U.S. 420, 429 (1961)). "One aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children." *Fleischfresser*, 15 F.3d at 684 (*citing Wisconsin v. Yoder*, 406 U.S. 205 (1972) (*other citations omitted*)).  Accordingly, the Court finds that plaintiffs have standing to challenge defendant's hiring practices based upon religious preference.

Upon review of the record, however, plaintiffs have failed to offer evidence sufficient to indicate that defendant's hiring practices have violated either the Establishment or Free Exercise Clauses.  First, plaintiffs have failed to set forth any direct evidence that defendant treated employment applicants differently based on their religious beliefs.  For example, Dr. Marsh admitted at his deposition that he did not know of any written policy of defendant that would authorize the administration to ask job applicants questions about their religious faith. Dr. Marsh also admitted that he had reviewed defendant's various teacher applications, and found that "none of them had any reference to any religious information in the application." In addition, neither plaintiff has ever been present during defendant's interviews of teaching applicants, nor have they ever been present for any hiring discussions.  In sum, plaintiffs have presented no direct evidence that defendant treated employment applicants differently based upon religious beliefs.

Plaintiffs' evidence on this issue consists of the statistic that 34 out of 68 new hires were Baptist, (or similar evangelical faith), and that Dr. Hudgens is lying about the extent of his role in the hiring process.  Plaintiffs' statistic, however, is meaningless without

comparison to either the applicant pool or to the geographic location that defendant serves. The Court has no idea how many of the applicants were Baptist, Catholic, Episcopalian, Islamic, Methodist, Presbyterian, or any other religion.  The Court also has no idea what the religious make-up is of the geographic area that defendant serves.  Similarly, Dr. Marsh himself admitted that with regard to the citizens in Marion, Illinois, he does not know what percentage of these citizens are members of the Baptist Church. Without knowing whether the percentage of Baptist hires was disproportionate compared to the applicant pool or to the population of the geographic area served, the Court cannot draw any inference, reasonable or otherwise, as to whether defendant's hiring may have been disproportionately Baptist.

Perhaps plaintiffs' failure of proof can be explained by Dr. Marsh's deposition testimony.  When asked what steps he took to verify who the new hires were and whether they were members of the Baptist faith, Dr. Marsh said, "We basically left that part of our investigation fall to the back burner when it appeared as though the practices were changing."  (Doc. 82, Exh. B, p.116).  When asked how the practices were "changing," Dr. Marsh said, "[i]t appears that there is not an inordinate number of new hires being hired that attend Second Baptist Church at this moment."  (Doc. 82, Exh. B, p.116).

Finally, plaintiffs have offered no evidence to indicate that the hiring of these 34 Baptist employees has had the purpose or effect of aiding or promoting religion, resulting in excessive entanglement with religion, or inhibiting plaintiffs' free exercise of religion.  For support, plaintiffs cite cases such as *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203 (1963), and *Berger v. Rensselaer Central School Corp.*, 982 F.2d 1160 (7th Cir. 1993).

In these cases, however, the record was clear that what had occurred were direct infusions of religion into the classroom.  *See e.g., Abington School Dist.,* 374 U.S. at 203 (Pennsylvania statute required public schools to begin each day with daily Bible readings); and *Berger v, Rensselaer Central School Corp.*, 982 F.2d 1160 (school permitted Gideon International representatives to make a presentation to students during the regular attendance school day and to distribute free Gideon Bibles in the classroom).  Here, in contrast, (as will be shown), plaintiffs offer no evidence that the hiring of Baptist employees had any effect upon defendant's curriculum content or has resulted in an impermissible direct infusion of religion into the classroom.  Rather, plaintiffs ask this Court to simply take a leap of faith that defendant's hiring of Baptists automatically results in an infusion of Baptist evangelism into the schools.  This the Court will not do, particularly in light of the fact that there is no evidence that such a phenomenon has occurred.  For all of the above reasons, plaintiffs' claim that defendant engaged in hiring practices that violate the First Amendment must fail.  Defendant's motion for summary judgment on this claim is granted.

      **C.**    **School Assemblies and Ticket Distribution.**

      Plaintiffs allege that the school assemblies featuring Dr. Hill and the distribution of the pizza party tickets violated the Establishment Clause.  Plaintiffs offer testimony that Mandy Marsh was handed a pizza ticket at school by another student.  Plaintiffs also offer evidence that a cafeteria worker wore a ticket on her shirt and that Dr. Hudgens' wife, (Deana Hudgens), failed to confiscate a ticket that a student received during classtime. (Doc. 90, Exh. K, p.1).

1.     **Undisputed Facts.**

Before the beginning of the 2003-2004 school year, defendant had scheduled a D.A.R.E. program that was cancelled. (Doc. 82, Exh. A, ¶ 22).  D.A.R.E. is a national program which encourages kids to refrain from using drugs and alcohol. (Doc. 82, Exh. A, ¶ 23).  Thereafter, defendant was contacted about possibly replacing the canceled D.A.R.E. program with a school assembly that featured Dr. Ronnie Hill, who could also speak to the students about refraining from drugs and alcohol.  (Doc. 82, Exh. A, ¶24).

On November 17th and 18th, 2003, defendant hosted school assemblies featuring Dr. Hill.  It is undisputed that as a fourth-grade student, Mandy Marsh was not invited to the assemblies, nor did she attend. (Doc. 82, Exh. D, p.53).  It is also undisputed that Dr. Hill's presentation to the students was secular in nature and contained no religious overtones. (Doc. 82, Exh. B, p.82).  None of the students were required to attend this event, rather, attendance was optional and they could attend a study hall instead. (Doc. 82, Exh. A, ¶38).

With regard to the pizza ticket distribution, it is undisputed that Mandy Marsh did not receive a pizza ticket from a school official during classtime. (Doc. 82, Exh. C, pp.13-14).  Instead, one of her friends handed her a ticket as she was walking through the hallway between class periods. (Doc. 82, Exh. C, pp.13-14).

2.     **Analysis.**

With regard to the school assemblies featuring Dr. Hill, the Court notes initially that plaintiffs lack standing to bring these claims.  To determine whether a party has standing to bring a claim in federal court, the United States Supreme Court has set forth a three-part test.

First, plaintiffs must have suffered an "injury in fact" - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be "fairly trace[able] to the challenged action of the defendant."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (*citations omitted*).

As noted, Dr. Marsh has standing to challenge practices that affect the right to control a child's religious education, and Mandy has standing to challenge religious intrusions upon her public education or free exercise of religion. *See Fleischfresser,* 15 F.3d at 683-84.  Such standing, however has its limits.  Parents may only obtain redress for wrongdoings which directly affect them or their children. *See Daugherty v. Vanguard Charter School Academy*, 116 F.Supp.2d 897, 905 (W.D. Mich., 2000) (*citing Fleischfresser*, 15 F.3d at 683). Activities and practices that did not directly affect Mandy cannot be said to have burdened her freedom of conscience or her father's right to guide her religious upbringing, and are thus not actionable.  *Daugherty,* 116 F.Supp.2d at 905.

Here, at the time of the assemblies, Mandy Marsh was a fourth-grade student.  It is undisputed that the school assemblies were open only to fifth-grade students and above.  It is further undisputed that Mandy did not attend the school assemblies.  As such, plaintiffs lack standing to bring these claims.

The Court also notes that plaintiffs' claims with regard to the Dr. Hill assemblies are

moot.  Article III of the United States Constitution limits a Court's jurisdiction to actual cases or controversies.  U.S. Const. Art. III, § 2; *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990).  Here, the school assemblies occurred on November 17th and 18th, 2003, and have long since been over.  Accordingly, plaintiffs' claims regarding the assemblies and ticket distribution are moot.

Plaintiffs argue that this case falls within an exception to the mootness doctrine because it is a case that is "capable of repetition yet evading review."  In addition, plaintiffs cite *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), to argue that it is defendant's burden to show that the assemblies featuring Dr. Hill or other evangelists are not likely to re-occur.  *Laidlaw*, however, involved a defendant's voluntary cessation of a practice of polluting a waterway with amounts of mercury that were over the legal limit.  Here, there is no indication that defendant has or had a "continuing practice" of hosting school assemblies that feature religious evangelists.  Once again, plaintiff asks this Court to assume facts that are not in the record.  The record indicates that Dr. Hill's assembly was a one-time event that occurred as a result of the D.A.R.E. program being canceled.  Plaintiffs offer no admissible evidence that such assemblies are likely to occur in the future.  As such, plaintiffs' claims regarding the assemblies are moot and the mootness exception does not apply.  *See Board of Education of Downer's Grove Grade School District, No. 58 v. Steven L.*, 89 F.3d 464, 467-68 (7th Cir. 1996) (*citations omitted*) (to fall within mootness exception, alleged injury must be of inherently limited duration and likely to happen again to the same complaining party).  Based on the above, plaintiffs lack standing to bring claims

- 20 -

regarding the assemblies, and in any event, plaintiffs' claims in this regard are moot.

Even if plaintiffs did have standing to challenge the assemblies and the claims were ripe for review, plaintiffs cannot establish a First Amendment violation under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). As noted, under *Lemon*, for a challenged state action to pass constitutional muster, it must: 1) have a secular purpose, 2) have a primary effect that neither advances nor inhibits religion, and 3) not foster excessive entanglement with religion. *Fleischfresser,* 15 F.3d at 686 (*citing Lemon*, 403 U.S. at 612-13). Here, it is undisputed that Dr. Hill's speeches on November 17th and 18th, 2003, were entirely secular in nature. Specifically, the primary effect of the assemblies was to give students information regarding teen-age pressures, such as refraining from the use of drugs and alcohol. Nothing in the record suggests that Dr. Hill presented any religious information or messages during the assemblies.

With regard to the pizza ticket distribution, plaintiffs' claims must also fail. Although plaintiffs have standing to bring these claims, (i.e., Mandy received a pizza ticket from a friend at school), plaintiffs' claims with regard to the tickets, as with the Dr. Hill assembly claims, are moot. Furthermore, plaintiffs have offered no evidence that district administrators or personnel were distributing the tickets. The fact that some students passed out tickets without the district's permission or that parents stood outside the school buildings and distributed tickets simply does not constitute a First Amendment violation by defendant. *Gernetzke,* 274 F.3d at 468. For all of the above reasons, plaintiffs' claims in this regard

must fail.[3]

### D.  **Defendant's Curriculum.**

Plaintiffs allege that defendant has been encouraging teachers to impart religious teachings, particularly those of the Baptist faith, during class time.  Although plaintiffs have not observed any religious teachings in the classroom, Dr. Marsh states that another parent once told him about such an occurrence.  Specifically, that parent said that his son said that a junior high school teacher said, while they were both in a classroom, that the son had to go to a specific type of church to get into heaven. (Doc. 82, Exh. B, pp.39-40).

### 1.  **Undisputed Facts.**

Defendant has a policy that sets forth the curriculum content for each grade which states:

CURRICULUM CONTENT

The curriculum shall contain instruction on subjects required by State statute

---

[3]Plaintiffs make much of a letter that Dr. Marsh found in Dr. Hudgens' trash. (Doc. 90, Exh. E, Att. 1, Defs. Exh. 14).  Specifically, plaintiffs allege that the letter shows that Dr. Hudgens and his attorney violated the Court Order by telling a parent named Lisa Cruse that the administration would not prohibit students from distributing the tickets.  Upon review, however, the letter states that ". . .you and I were careful to tell Lisa Cruise *on Friday afternoon* that we would not prohibit the students from distributing the tickets." (Doc. 90, Exh. E, Att. 1, Defs. Exh. 14) (*emphasis added*).  After Friday afternoon, however, the parties continued to negotiate through the weekend as to how the assemblies would be conducted on Monday morning.  The letter further states that on Monday morning, "The court ordered that the tickets not be distributed.  *We abided by the Order on Monday and prohibited the students from passing out the tickets.*" (Doc. 90, Exh. E, Att. 1, Defs. Exh. 14) (*emphasis added*).  Thus, it appears from the record that defendant's alleged decision to let students distribute tickets was made prior to the completion of the parties' subsequent discussions and was later modified.

or regulation, including the following:

    1.    Kindergarten through Grade 8: (a) language arts, (b) reading, (c) other communication skills, (d) science, (e) mathematics, (f) social studies, (g) art, (h) music.

*** 

*(Doc. 82, Exh. A, Att. 3).*

Nowhere does the written policy state that religious teachings are included in the curriculum.  At his deposition, Dr. Marsh stated that neither he nor his daughter ever observed any classroom teaching by the teacher who is alleged to have made the above statement. (Doc. 82, Exh. B, pp.39-40).

    2.    **Analysis.**

Initially, the Court notes that defendant has a written policy that governs curriculum content for grades Kindergarten through twelve. (Doc. 82, Exh. A, Att. 3).  According to the policy, religious teachings are not included in the curriculum.

The Court also notes that plaintiffs have set forth no credible evidence that religious teachings have occurred during classtime.  Plaintiffs' evidence on this issue is that in June, 2005, Dr. Marsh heard another parent say that his son, (J.S.), who is in junior high, said that a teacher allegedly "preached to [him] in the classroom." (Doc. 82, Exh. B, p.40).  This evidence, however, is hearsay and is not based on personal knowledge.  As such, it is inadmissible to oppose a motion for summary judgment. *Fed.R.Civ.Proc. 56.*  Furthermore, there is no evidence to support plaintiffs' allegations that "religious teachings have occurred during class time."  Here, the evidence is nothing more than that a junior high school teacher

- 23 -

made an isolated remark to a student while they were still inside of a classroom.  While the Court certainly does not condone such commentary by public school teachers during the school day, there is no evidence of whether the remark was made during classtime, whether it was before or after class, or whether any other students were present.  It should come as no revelation to plaintiffs that an isolated, offhand comment to a junior high school student by a teacher that favoring one religion over another is clearly a far cry from plaintiffs' allegation that teachers were "preaching during classtime."  Plaintiffs' allegations simply are not supported by the evidence.  In addition, there is no evidence that defendant either sanctioned, or even knew about, the alleged activity.  As such, plaintiffs' claims in this regard cannot survive summary judgment.  *Gernetzke*, 274 F.3d at 468 (*citations omitted*) (to prevail on § 1983 claim, plaintiffs must show that the district itself was directly responsible for the deprivation).  For all of the above reasons, plaintiffs' claims that defendant's curriculum violates the First Amendment must fail.[4]

### E.   Summer Theater Program and Teacher Institute.

Plaintiffs claim that defendant violated the First Amendment by:  1) sponsoring  a Summer theater program for students that contained religious teachings, and 2) conducting

---

[4]Plaintiff also offers testimony from Mike Simmons, a parent from Creal Springs, Illinois, who states that he complained to the School Board about the Dr. Hill assemblies, the pizza tickets, and the alleged preaching. (Doc. 90, Exh. M, p.29).  Mr. Simmons also testified, however, that he failed to complain to the Board until the calendar year 2005, well over one year after the Dr. Hill assemblies and church pizza party had occurred. (Doc. 90, Exh. M, p.29). Accordingly, Mr. Simmons' testimony regarding his complaints to the Board is too remote in time to the alleged events and lacks relevancy.  *See Fed.R.Evid. 401,402.*

a February 2005 teaching institute that contained a Christian presentation.

### 1.    Undisputed Facts.

During 2005, Mandy Marsh participated in a school-sponsored Summer theater program that included production of the musical play, *Aladdin*. Students performed *Aladdin* at various places in the local community. (Doc. 82, Exh. A, ¶61; Exh C, pp.11-12). Specifically, all cast members were invited to perform at the Marion Junior High for the "Relay for Life" cancer fund-raising group, the Second Baptist Church, and the Aldersgate United Methodist Church, (Doc. 90, Exh. F, Att.2), as well as at the local community civic center. (Doc. 82, Exh. C, p.12). A small group of cast members was needed to perform for a local radio program, the rotary club, and a senior citizens center. (Doc. 90, Exh. F, Att.2). Mandy Marsh participated in the performances at both of the churches and the civic center, but she did not perform at the Relay for Life event, or the small group events because only a small group of cast member was needed for those performances. (Doc. 82, Exh. B, pp.235-240; Exh. D, pp.34-40).

Participation in the Summer theater program was voluntary. (Doc. 82, Exh. B, pp.239-240). Prior to each of the *Aladdin* performances, parents were notified where and when the students would be performing. (Doc. 82, Exh. B, pp.235-240) (Doc. 90, Exh. F, pp.34-38, Att. 2). Prior to the two church performances, Dr. Marsh was notified that the students were going to perform at the church, stay for a church service, and then perform again. (Doc. 82, Exh. B, pp.238-239). Parents had the option of choosing not to perform at any or all of the

performance locations. (Doc. 82, Exh. B, pp.235-240) (Doc. 90, Exh. F, pp.34-38).  Although plaintiffs' attendance at the church performances was not required, Dr. Marsh asserts that his daughter would have felt "ostracized" because there was an "expectation that she be there." (Doc. 82, Exh. B, p.240).

At the Second Baptist Church, the students sat through a sermon.  At Aldergate United Methodist, during the sermon they were allowed to go to the back of the church where food was being served. (Doc. 82, Exh. C, p.12).  When asked about his concerns regarding the Summer Theater program, Dr. Marsh responded:

> Two of those locations were at local churches.  *I felt one of them was handled entirely appropriately for students coming in and performing at a church, and I felt the other one was handled entirely inappropriately.*

*(Doc. 82, Exh. B, p.236).*

When asked why he thought one was handled inappropriately, (i.e., the Second Baptist Church), he responded that the students were forced to listen to a sermon, and that the sermon was designed to criticize parents who tried to keep God out of schools.  Plaintiffs construed the sermon as a personal attack upon Dr. Marsh. (Doc. 90, Exh. E, pp.237-240) (Doc. 82, Exh. C, pp.11-12).

In February 2005, a committee made up of representatives from five Williamson County school districts sponsored a teacher institute that allegedly included a presentation by a Christian counselor. (Doc. 82, Exh. A, ¶¶64,65).  Defendant did not sponsor this event and neither plaintiff was invited or attended. (Doc. 82, Exh. A, ¶¶64,65).

## 2.    __Analysis.__

With regard to the Summer theater program, the record shows that along with performing at a Baptist Church, the students also performed at a Methodist church, as well as at several community locations of a secular nature.  Specifically, the play was performed at the Marion Junior High School for the Relay for Life group, and a subset of cast members performed for a local radio program, at a community civic center and at a nursing home.  Furthermore, the record shows that the students' participation in the program and their performances, including those at the churches, was voluntary.  Here, the Court finds it curious that despite Dr. Marsh's claim that Mandy would feel "ostracized" because there was an "expectation that she be there," (i.e., at the scheduled performances), Dr. Marsh apparently did not ensure Mandy's attendance at the Relay for Life event, (nor does he offer an explanation for her absence).  It is quite curious that nonetheless, he *was* able to ensure her attendance at the very institutions he claims to violate their First Amendment rights, (i.e., the performances at both of the local churches).

As noted, Dr. Marsh admitted in his deposition that before the performance at the Second Baptist Church, he was aware that Mandy's performance was voluntary and that she would be staying for the entire church service.  Nonetheless, he approved of her performing at the church and of her staying for the complete service. (Doc. 82, Exh. B, pp.239-240).  Because plaintiffs' participation at the church was voluntary, plaintiffs' constitutional claims must fail. *Bauchman for Bauchman v. West High School*, 132 F.3d 542, 557 (10th Cir. 1997)

(where performance was voluntary, choir's performance of "religious" songs did not violate Free Exercise clause of the First Amendment).  Furthermore, the Court finds that upon review of the record, the Summer theater program's performance of *Aladdin* had a secular purpose, its primary effect was neither to advance nor to inhibit religion, and it did not foster excessive state entanglement with religion.  *Lemon,* 403 U.S. at 612-613.  Finally, plaintiffs have offered no evidence to show that the District was involved in or approved of the activity, thus, defendant cannot be held liable.  *Gernetzke*, 274 F.3d at 468.

With regard to the February 2005 teaching institute, plaintiffs lack standing to bring this claim.  There is no evidence that plaintiffs attended the meeting or that they were affected by it in any way.  Plaintiffs do not have standing to bring a claim when they are merely asserting the interests of third-parties.  *See Clay v. Fort Wayne Community Schools*, 76 F.3d 873, 878 (7th Cir. 1996) ("A plaintiff must assert his own legal interest and not the legal interests of third parties.").  Even if plaintiffs did have standing to challenge the teaching institute, it is undisputed that defendant did not sponsor the event, rather, it was sponsored by a county-wide committee that served and included other school districts.  Accordingly, plaintiffs cannot hold defendant liable.  *Gernetzke*, 274 F.3d at 468.

For all of the above reasons, plaintiffs' claims regarding the Summer theater program and the February 2005 teaching institute must fail.  Defendant's motion for summary judgment on these claims is granted.

**VI.**     <u>**Summary**</u>**.**

Based upon the above, defendant's motion for summary judgment (Doc.82) is

**GRANTED.**   Defendant's motion to strike plaintiffs' response (Doc.94) is **MOOT.**

Judgment shall be entered for the defendant and against plaintiffs.  A separate Judgment shall

accompany this Memorandum and Order.

      **IT IS SO ORDERED.**
      **DATED:   August 23, 2006.**

                                        *s/ James L. Foreman*
                                        **DISTRICT JUDGE**